19 CCPA

**Application of Leo J. NOVAK and Joseph T. Tyree.**

**Patent Appeal No. 6789.**

United States Court of Customs and Patent Appeals.

July 25, 1962.

Toulmin & Toulmin, Harry A. Toulmin, Jr., and Folsom E. Drummond, Washington, D. C., for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel) for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This is an appeal from a decision of the Board of Appeals of the U. S. Patent Office affirming the examiner's rejection of claims 10, 11 and 12, all of the claims of appellants' application, Serial No. 638,-889, filed December 3, 1956, for a patent on "Thickening and Gelling Agents."

The following claims are representative:

"10. A thickening and gelling composition for aqueous media and which is stable in acid solutions of a carboxymethyl ether of a readily water-soluble, high molecular weight dextran, said dextran ether containing an average of from a minimum of about 0.8 to 1.5 carboxymethyl groups per anhydroglucose unit of the dextran and which produces a firm, stiff gel when 0.5% by weight is added to an aqueous solution having a pH of about 3.0 to 7.0.

"12. A method of making carboxymethyl ethers of dextran containing an average of from a minimum of about 0.8 to 1.5 carboxymethyl groups per anhydroglucose unit and having the capacity to gel water at pH 3.0 to 7.0 in a concentration of 0.5% by weight, which comprises preparing an aqueous solution of inherently readily soluble high molecular weight dextran containing an alkali metal hydroxide, adding the dextran solution to an aqueous solution of alkali metal chloracetate, holding the combined solutions at 10° C to 100° C for a time varying inversely with the temperature between 15 minutes and two hours, adjusting the pH of the solution to 2.0

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

to 3.0, mixing the acid solution with a precipitant for the carboxymethyl dextran selected from the group consisting of water-miscible aliphatic alcohols and ketones, recovering the precipitated carboxymethyl dextran, removing water and precipitant associated with the ether, dissolving the carboxymethyl dextran in water, mixing the aqueous solution with the precipitant, separating the reprecipitated carboxymethyl dextran, and drying the ether."

Product claim 11 is limited to an ether containing "an average of about 1.0 carboxymethyl group per anhydroglucose unit" but is otherwise the same as claim 10.

The references relied on by the examiner and the board are:

| Moe I | 2,523,709 | Sept. 26, 1950 |
|---|---|---|
| Filbert | 2,599,620 | June 10, 1952 |
| Moe II | 2,599,771 | June 10, 1952 |
| Gaver et al | 2,671,779 | March 9, 1954 |
| (filed June 8, 1948) | | |

---

The application relates to certain carboxymethyl ethers of dextran and to a process of making them. These ethers are said to be useful as thickening and gelling agents for acidic aqueous media. For example, they are useful "as thickening and stabilizing additives for various polyvinyl resin emulsions such as polyvinyl acetate emulsions, natural and synthetic latex, and water-based paints." The application states that "the carboxymethyl dextrans of the invention are vastly more effective for increasing the viscosity of water than the commercially available carboxymethyl cellulose even at the same concentration." Also, it is disclosed that as little as 0.5% by weight of the claimed ethers added to aqueous media with a pH from 3.0 to 7.0 will form a "firm to stiff gel" which is stable even when "boiled for variable times and then cooled."

The following background material, gleaned from the record and briefs, is not at issue [1] and will aid in understanding what has been claimed and our disposition of the sole issue in this case which is the patentability of the appealed claims in view of the above cited references.

Polysaccharides are polymeric substances, the repeating monomeric units of which usually contain five or six carbon atoms as well as one or more hydroxyl groups, usually designated -OH. Some of the known polysaccharides are starch, cellulose and dextran. In each of these, the repeating unit contains 3 hydroxyl groups and is designated generically "anhydroglucose." It appears that differences in properties among the polysaccharides are explained on the basis of differences in molecular structure of the repeating units and in the nature of the attachment of units one to another. It also appears that the structural relationship of dextran to other polysaccharides was known on the effective filing date of the appealed application.

The record also shows that more than one form or type of dextran is known. Dextrans generally are prepared by the action of microorganisms or enzymes on sucrose in the presence of an aqueous nutrient medium. Appellants require for their invention a "readily water-soluble, high molecular weight dextran" and describe how to make such a material.

The dextran of choice is transformed into the claimed ether by changing some

1. For example, some of this material is taken from certain statements in one of appellants' letters to the examiner and attributed to a Dr. Allene Jeanes.

As to these statements, the examiner stated in his answer: "The opinion expressed by Dr. Jeanes has been noted and no issue has been taken therewith."

of the -OH groups of each anhydroglucose unit to carboxymethyl ether groups. The symbol for such a group is -OCH$_2$COOH. This is done by reacting the dextran in an aqueous solution containing an alkali metal hydroxide with an alkali metal chloracetate at 10°C. to 100° C. In further regard to appellants' process, the specification states:

> "The reaction product is a viscose solution of the alkali metal salt, e. g., the sodium or potassium salt of the carboxymethyl dextran, in water containing the excess alkali metal hydroxide and chloracetate.

> "In order to precipitate the free ether from the solution of the sodium or potassium carboxymethyl dextran obtained as the initial reaction product to the acid side, it is necessary to first adjust the pH of the solution and to then precipitate the free ether from the acidified solution, thereby removing the electrolytes as NaCl. Removal of inorganic salts is critical to obtaining carboxymethyl dextran having the desired thickening and gelling property at acid pH. Satisfactory precipitation of the ether can be accomplished at pH 2.0 to 3.0. The ether so precipitated rapidly gels water and aqueous media, * * *.

> "The free ether is precipitated from the acidified solution by the addition of a water-miscible alcohol or ketone, such as methanol, ethanol, isopropanol or acetone. The ether may be further purified by reprecipitation thereof from aqueous solution on addition of the water-miscible alcohol or ketone."

It will be noted that claim 10 recites a product containing "an average of from a minimum of about 0.8 to 1.5 carboxymethyl groups per anhydroglucose unit of the dextran." As pointed out supra, each anhydroglucose unit originally contained three -OH groups. Therefore, in appellants' ethers, not all of these -OH groups have been transformed to carboxymethyl ether groups.

We turn now to the prior art of record. Moe I discloses carboxymethyl ethers of starch which display "phenomenal viscosities" in aqueous solution. Such ethers are produced by reaction of "any starch" in aqueous sodium hydroxide solution with sodium chloracetate at, for example, 80° C. It appears that, as in appellants' process, hydroxyl groups are replaced with carboxymethyl groups. Moe I states with regard to his product:

> "The degree of ether substitution is another variable which may be varied quite widely. Phenomenal viscosities have been obtained with the degree of substitution as low as 0.2. Higher degrees of substitution such as 0.3 to 1.0 result in somewhat increased viscosities."

It is clear from the record that "degree of substitution" refers to the average number of carboxymethyl groups per anhydroglucose unit of the Moe I starch ether product. With regard to aqueous solutions of his product, Moe I states:

> "These solutions are so viscous that they lose nearly all tendency to flow. A large container of a ½ to ¾ % solution can be inverted without any tendency for the solution to flow out of the container."

Other details of Moe I will be discussed later in this opinion.

Filbert discloses water-soluble carboxymethyl ethers of starches and polyuronides and, more particularly, of starches, gums and hemicelluloses [2] which

2. The following definitions from Webster's Third New International Dictionary (1961) are relevant here:
"polyuronide * * *: a polymeric substance consisting of uronic acid units with glycosidic linkages often in combination with monosaccharides and occurring widely in plants (as in gums and pectic substances) and in soils * * *.

"gum * * * 1 a: any of numerous colloidal polysaccharide substances that are gelatinous when moist but harden on drying, that are exuded by plants * * *.
"hemicellulose * * *: any of various polysaccharides that accompany cellulose and lignin in the skeletal substances of wood and green plants and

are said to be useful "in many fields, such as textile and paper manufacture" where "a high viscosity characteristic is greatly desired." Filbert's ethers are produced by reaction of a polysaccharide with chloracetic acid or sodium chloracetate and sodium hydroxide in certain water-alcohol mixtures at 50 to 85° C. The desired carboxymethyl ethers are obtained from the resulting reaction mixtures by neutralization with acetic acid and separation of the solid product. Filbert also discloses the viscosity of 1% solutions of many of his ethers.

Moe II discloses carboxyalkyl ethers, including carboxymethyl ethers, of certain "carbohydrate gums." The patent states:

"The invention is applicable to carbohydrate gums selected from the group consisting of galactomannan and glucomannan gums. These gums are polysaccharides composed principally of galactose and mannose units and glucose and mannose units respectively."

These ethers are said to be useful because their "aqueous sols" form firm gels on addition of an aqueous solution of a salt of a polyvalent metal such as aluminum sulfate. Moe II also comments on the properties of the "sols" themselves. For example, he states:

"The sodium carboxymethyl ether of locust bean gum thus prepared was readily dispersible in water to form 1% sols of remarkable clarity and stability and of a viscosity comparable to or higher than that of the gum itself. A 3% sol of very good clarity and high viscosity was very readily obtained."

These ethers of Moe II are produced by reaction of the carbohydrate gum in aqueous solution first with sodium hydroxide at 60 to 90° and then with

chloracetic acid or sodium chloracetate at 80 to 85° C. The ether is isolated by acidification of the reaction mixture and precipitation by addition of a water-miscible organic solvent such as methanol or acetone.

Gaver et al. disclose the use of any of a variety of carbohydrates, particularly polysaccharides, in the preparation of compositions in which one or more of the hydroxyl groups of each unit is transformed to another group which may be represented by the symbol -OR, where R is some organic substituent. Gaver et al. consider this general type of reaction an "etherfication" [etherification?]. Prominent among the processes disclosed by Gaver et al. is one involving the treatment of a polysaccharide first with an alkali hydroxide such as sodium hydroxide in a non-aqueous solvent such as an alcohol and then with an organic reactant such as an organic halide. By this particular process, *one* of the -OH groups of each repeating unit[3] is replaced by an organic substituent.

Among the 13 specific numbered examples disclosed by Gaver et al. as illustrative of the processes of their invention, two disclose the interaction of a polysaccharide[4] with an alkali metal hydroxide, an alcoholic reaction solvent and sodium chloracetate. It is clear from Gaver et al. that this is the same type of transformation of polysaccharide hydroxyl group to polysaccharide carboxymethyl ether group disclosed by appellants, Moe I and II and Filbert. In two places in the specification, Gaver et al. refer to dextran as a polysaccharide which can be used in their processes. In the introductory portion of the specification, it is stated:

"Our new processes are applicable to all types of carbohydrates such as monosaccharides, disaccha-

that resemble cellulose in being insoluble in water and hydrolyzable in simple sugar units by acids * * *."

3. Gaver et al. refer to these as "glucopyranose units." Apparently this is another name for what appellants and Filbert designate as "anhydroglucose units."

4. "A commercial corn dextrin of the so-called alkali-converted type" was used in one example. In the other example, locust bean gum was used. Both of these are polysaccharides. In each case, one carboxymethyl group was introduced into each repeating unit.

rides, trisaccharides, tetrasaccharides and polyamyloses which are sometimes collectively designated as sugars; polysaccharides including polypentoses and polyhexoses, the latter including dextrins, starches, cellulose, lichenin, *dextran,* glycogen, etc.; conjugated saccharides including gums, glucosides and tannins; and derived saccharides." [Emphasis ours.]

Later in the specification, in discussing the particular reaction outlined supra. Gaver et al. state: [5]

"This reaction is the same when using waxy rice, yucca, sago, arrowroot, sweet potato, potato, corn, wheat, tapioca and amioca starches; a series of *thin boiling starches;* wheat, potato, tapioca and corn dextrins; *dextran;* cotton, linen, jute, ramie and other cellulose material; sucrose; inulin; and gum and other mixed hexosans, pentosans, etc." [Emphasis ours].

Finally, we note that Gaver et al. do not suggest any particular utility for the products disclosed or claimed in their patent.

The appealed claims were rejected by the examiner "as being unpatentable over each of Moe I and II, Filbert and Gaver et al."

The examiner stated:

"The above references clearly shows [sic] the carboxyalkyl ethers of many and varied carbohydrates, with teachings of the generic concept of carboxyalkyl ethers of polysaccharides. It is the Examiner's position that it does not involve inventive concept to apply these principles to dextran to obtain watersoluble ethers in accordance with the teachings of the references, particularly so in view of the fact that the equivalence of dextran, starch, cellulose, etc. in reactions involving the functional hydroxy groups is shown by Gaver et al. No patentable significance is given to the intro-ductory clause relative to the intended use of the composition or the properties exhibited.

"Applicants admit that carboxyalkylation of polysaccharides is not new but urge patentability over the references on the ground that cellulose, starch and dextran are not equivalent as shown by Gaver et al; particularly dextran produced microbiologically as employed by them. This argument has been considered but it is not persuasive that the position taken is in error. It is pointed out that since it is the functional hydroxyl groups that are active in this type of reaction, it would not amount to invention to substitute any polymeric carbohydrate containing such groups for cellulose and starch taught by the references. Even if it were granted that one would not expect with certainty in advance of experimentation that what has been done with other carbohydrates could also be done with dextran, it would appear that in view of the similarities between dextran and other carbohydrates, it would be obvious to try reactions previously successful on starch or cellulose. * * *

* * * * * *

"In the instant case it appears that at best applicants have merely applied to an old process to another and analogous material with at least reasonable expectation of success. It is well settled that this does not constitute invention."

The board affirmed the examiner's rejection, stating in part:

"The disclosure in the Gaver et al. patent in column 11, last full paragraph, * * * constitutes a clear teaching, with respect to the particular reaction involved herein, as to the equivalency of dextran with carbohydrates such as starch and cellulose. The disclosure in Gaver et al. in the listing of chlor-

---

5. This particular statement appears in Gaver et al., column 11, last full paragraph.

acetic acid as an etherifying agent is regarded as a sufficient teaching of the production of carboxymethyl ethers of dextran in which the etherifying group is present in the ratio as defined in the claims herein.

"We accordingly regard the compounds claimed in claims 10 and 11 as being clearly within the teaching in Gaver et al. alone, and as obvious in view of the teachings in Moe I and II and the patent to Filbert, in which the etherifying reaction is applied to equivalent materials. While, as noted by appellants, Gaver et al. employ nonaqueous conditions during the etherifying reaction, the use of water as a solvent for water-soluble material would be apparent from the disclosures in the Moe patents I and II, in which the reaction is carried out in an aqueous medium."

The board also pointed out that claims 10 and 11 "are, in essence, directed to a carboxymethyl ether of dextran containing between .8 and 1.5 carboxymethyl groups per anhydroglucose unit."

First, we will comment on the Gaver et al. patent. The board regarded the compounds of claims 10 and 11 "as being clearly within the teaching in Gaver et al. alone." Because we agree with the examiner and the board as to the obviousness of the claimed compounds and process in view of the patents to Moe I and II and Filbert, it is unnecessary to discuss the issue of patentability of the claims in view of Gaver et al. alone. However, we note that appellants urge in their brief that "the Gaver et al. patent cannot be cited as a reference against appellants' application" because appellants are "entitled to the filing date of their parent application, viz., March 31, 1953." In the oath attached to the application at bar it is stated that the application is a continuation-in-part of a March 31, 1953 application of appellants. Moreover, the initial letter of the examiner in the case at bar was a final rejection and stated:

"The issues of the instant case are identical to those presented in the parent application, and all remarks, made therein, relative to the above applied prior art are applicable to the instant case."

Thus there *seems* to be basis in fact for appellants' contention that they are entitled to a March 31, 1953, filing date. However, whatever legal basis there may be to appellants' contention that the Gaver et al. patent is for that reason not a proper reference, and we express no opinion on this point, it does not apply to the use which we make of the Gaver et al. patent disclosure in affirming the board. We use Gaver et al. solely as a convenient indication of the state of the prior art at the time, June 8, 1948, when Gaver et al. filed their application in the Patent Office. Then, the "etherfication" of polysaccharides was old. For example, Gaver et al. state:

" * * * a great many workers have done extensive research in the etherfication of carbohydrates such as cellulose, starch, the sugars and other polysaccharides."

Elsewhere in Gaver et al. are abundant comments on what had been done in this area by previous workers. Gaver et al. advanced beyond that prior art and for that advancement they received a patent. It is unnecessary to consider the nature of that advancement. That polysaccharides generally, including cellulose, starch, gums, hemicellulose *and dextran*, would undergo "etherfication" reactions generally like those disclosed by Moe I and II, by Filbert *and by appellants* was known prior to the filing date of Gaver et al. In describing this old information, Gaver et al. have merely complied with Rule 71(b) in setting forth their invention "in such manner as to distinguish it from other inventions and from what is old." [6] See In re Howell, Jr., 298 F.2d 949, 49 CCPA 922.

6. Rule 71(b), Rules of Practice of the United States Patent Office in Patent Cases (1960), 35 U.S.C.Appendix.

Coming then specifically to product claims 10 and 11, we agree with the board that these claims are unpatentable over Moe I and II and Filbert in view of the known equivalence of polysaccharides such as cellulose, starch, gums, hemicellulose and dextran in "etherfication" reactions of the sort disclosed by these patents. Moe I and II and Filbert each point out the importance of the viscosity characteristics of carboxymethyl ethers of starch, gums and hemicellulose. This is the basis of the utility of appellants' claimed products. Moreover, appellants themselves in their specification add cellulose carboxymethyl ethers to the list of polysaccharide carboxymethyl ethers useful for this reason. Appellants urge that their products have "a surprising and remarkable effect on the viscosity of water" [7] and for that reason are patentable over the other prior art polysaccharide carboxymethyl ethers. We observe, however, that appellants' specification states:

"Removal of inorganic salts is critical to obtaining carboxymethyl dextran having the desired thickening and gelling property at acid pH."

We also observe that, after describing carboxymethyl starch ethers "which exhibit phenomenal viscosities in aqueous solutions," Moe I states:

"It is believed that the *removal of water soluble electrolytes* and the presence of some free carboxyl groups are responsible for the phenomenal viscosities observed." [Emphasis ours.]

It is clear from appellants' specification that the "water soluble electrolytes" removed by Moe I are the same as the "inorganic salts" removed by appellants. From this teaching of Moe I, it is therefore not "surprising and remarkable" that appellants' ethers have the same effect on the viscosity of water that the ethers of Moe I have.

■ Although it is true, as appellants appear to urge, that their products are not described in any of the reference patents within the meaning of 35 U.S.C. § 102, and although one would not *know* that the carboxymethyl ethers of dextran would be useful as thickening or gelling agents until he actually had such an ether at hand and added it to an aqueous medium, we think appellants' products would be obvious to one with ordinary skill in this art, aware as that person must be presumed to be and as Gaver et al. were of the equivalence of many polysaccharides including dextran in "etherfication" reactions, and aware as he would be of the teachings of Moe I and II and Filbert as to the properties and utility of several other polysaccharide carboxymethyl ethers. In other words, appellants' discovery that certain carboxymethyl dextran ethers give desirable viscosity characteristics to aqueous media does not, in our opinion, impart patentability to those ethers.

■ We turn next to process claim 12. We agree with the examiner and the board that this claim is unpatentable over the prior art, particularly the Moe I patent. The process recited in claim 12 is but an obvious way of making an obvious product. Although, of course, Moe I used starch rather than dextran in his process, as we have discussed in detail supra, these starting materials are known to be equivalent in "etherfication" processes. With regard to the other process details in claim 12, we note that in example 1 of Moe I, a mixture of starch, water and sodium hydroxide is combined with an aqueous solution of sodium chloracetate and the resultant mixture heated at 80–85° C. for 90 minutes. After acidification "to phenolphthalein," Moe I precipitates his product with methanol. Moe I also teaches the advantage of dissolving his carboxymethyl starch ethers in water and precipitating thereafter with methanol. Thus it can be seen that, except for the step in

---

7. Appellants' brief.

claim 12 of adjusting the pH of the reaction mixture to 2.0 to 3.0, each of the claim 12 limitations is taught by Moe I. With regard to the pH limitations, we observe that Moe I prefers to adjust the pH of his reaction mixture within the range of 4–7.[8] Moe I discovered that "the presence of some free carboxyl groups" is partly "responsible for the phenomenal viscosity observed" for his carboxymethyl starch ethers. However, Moe I also states:

> "Sufficient of the carboxyl groups must, however, be present in the form of a water soluble derivative such as the alkali metal salts, in order to contribute water solubility to the product."

Thus, Moe I seems to have chosen the particular pH range 4–7 because that range represents a compromise between the desirability of some free carboxyl groups and the need for the presence of some carboxyl groups in the alkali metal salt form. In view of the *water-solubility* of appellants' carboxymethyl dextran ethers and the clear teachings of Moe I as to the reasons for a particular choice of a pH range for precipitation, we think appellants' pH range of 2.0 to 3.0 was merely a matter of obvious choice which one of ordinary skill in this art could be expected to make. We think that such a skilled chemist would be expected to respond to the suggestion of Moe I as to the importance of free carboxyl groups in a carboxymethyl polysaccharide ether and try using pH values lower (more acid and therefore productive of more free carboxyl groups) than those used by Moe I, especially since appellants' ether is soluble in water. The discovery that a pH precipitation range of 2.0 to 3.0 is superior to a range of 4 to 7 in the production of carboxymethyl dextran ethers therefore does not impart patentability to claim 12.

8. According to Rose and Rose, "The Condensed Chemical Dictionary," 5th Ed. (1956), pH is defined as:
"A means of expressing the degree of acidity or basicity of a solution. Thus at normal temperature a neutral solution

For the foregoing reasons, the decision of the board is affirmed.

Affirmed.

KIRKPATRICK, Judge, sat but did not participate in decision.

such as pure distilled water has a pH of about 7, a tenth-normal solution of hydrochloric acid (* * *) has a pH near 1 and a normal solution of a strong alkali such as sodium hydroxide has a pH of nearly 14. * * *."